## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

NATHANIEL R. BRAZILL,

      Plaintiff,

v.                                                          Case No.  5:21-cv-99-TKW-MJF

JONATHAN JONES, *et al*.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

     This prisoner civil rights case is before the court upon Defendants' motion to dismiss Plaintiff's fourth amended complaint for failure to state a claim upon which relief can be granted. Doc. 58.[1] Plaintiff opposes the motion. Doc. 61. For the reasons set forth below, the undersigned recommends that Defendants' motion to dismiss be granted as to Plaintiff's individual and official-capacity claims against Ricky D. Dixon, but denied in all other respects.[2]

---

[1] The two later-served Defendants have adopted the motion to dismiss. Docs. 69, 77.

[2] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

# I. BACKGROUND AND PROCEDURAL HISTORY

Brazill is an inmate of the Florida Department of Corrections ("FDC") currently confined at the Wakulla Correctional Institution Annex in Crawfordville, Florida. Brazill initiated this lawsuit on April 29, 2021, by filing a civil rights complaint under 42 U.S.C. § 1983. Doc. 1.[3] Brazill's fourth amended complaint is the operative complaint. Doc. 28.

Brazill's fourth amended complaint names eight Defendants: FDC Secretary Ricky D. Dixon, FDC Regional Director Angela Gordon, and six prison officials at the Jackson Correctional Institution—Colonel Jonathan Jones, Senior Classification Officer Scott Bush, Assistant Warden of Programs Glenn Hancock, Lieutenant Abner Bowen, Warden Christopher Brannon, and Classification Supervisor Carol Pittman. Doc. 28 at 3-6. Brazill is suing each Defendant in his or her individual capacity, with the exception of Secretary Dixon who is sued in his individual and official capacities. *Id*.

Brazill claims that the Defendants violated his First-Amendment rights when they transferred him from the Graceville Work Camp and "banned" him from returning there, in retaliation for his filing grievances about the conditions of his

---

[3] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009).

confinement at Graceville (specifically, Graceville's uniform policy). *Id*. at 8-26. As relief, Brazill seeks declaratory relief, injunctive relief, nominal damages, and punitive damages. *Id*. at 25, 27.

Defendants move to dismiss Brazill's fourth amended complaint in its entirety for two reasons: (1) Brazill's claims are barred by the statute of limitations; and (2) the complaint fails to state a plausible First-Amendment retaliation claim against any Defendant. Doc. 58 at 4-19. Alternatively, Defendants assert that Brazill should be required to file a fifth amended complaint because: (1) Brazill's fourth amended complaint fails to comply with the pleading standards of Rules 8(a)(2) and 10(b) of the Federal Rules of Civil Procedure; (2) Brazill cannot recover the injunctive relief he seeks; (3) Brazill cannot recover more than $1.00 in nominal damages; and (4) Brazill's claim for punitive damages is excessive. *Id*. at 19-29.

## II. ALLEGATIONS OF BRAZILL'S FOURTH AMENDED COMPLAINT

The allegations of Brazill's fourth amended complaint set forth herein are those that satisfy the Rule 12(b)(6) standard. In other words, the undersigned included specific, well-pleaded allegations and omitted conclusory allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[4]

---

[4] On *summary judgment review*, however, the standard for accepting a plaintiff's allegation—as competent to raise a fact issue precluding summary judgment—is higher. On summary judgment review, even an allegation in a sworn complaint

In December 2019, Brazill was incarcerated at the Holmes Correctional Institution. Doc. 28 at 8, ¶ 2. Also in December 2019, the Institutional Classification Team ("ICT") at the Jackson Correctional Institution ("Jackson CI") made a request to other correctional institutions to transfer inmates with minimum security custody levels to Jackson CI for placement at the Graceville Work Camp ("Graceville"). *Id.* at 8, ¶ 3. Jackson CI is the "parent facility" for Graceville. *Id.* at 8, ¶ 5. On December 17, 2019, Brazill was approved for a "Department Needs" transfer from Holmes CI. *Id.* at 8, ¶ 4. The Department of Corrections transferred Plaintiff to Jackson CI on January 6, 2020, and on January 8, 2020, transferred Plaintiff to Graceville. *Id.* at 8-9, ¶¶ 5-6.

On January 12, 2020, Brazill submitted the following three informal grievances:

1.   a complaint that non-party Sergeant Russ required inmates to wear class A uniforms during formal counts;

2.   a complaint that he was prohibited from wearing his athletic shorts from the recreation yard to the canteen; and

---

cannot be considered unless it also satisfies the remaining requirements for affidavits set forth in Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(4).

3.      a complaint that Sergeant Russ required inmates to wear class A uniforms on weekends during formal "counts."

*Id*. at 9-10, ¶¶ 9-11. Defendant Bush collected these grievances. *Id*. at 10, ¶ 12.

On January 14, 2020, Brazill asked Bush why he (Brazill) was transferred from Holmes CI to Graceville. *Id*. at 10, ¶ 14. Bush responded that there was an insufficient number of eligible inmates at Jackson CI to be housed at Graceville, so the ICT at Jackson CI requested that inmates with minimum security custody levels from other institutions be transferred to Jackson for placement at Graceville. *Id*. at 10, ¶ 15. Brazill then asked Bush for the name of the official at Holmes CI who selected him for transfer. *Id*. at 10, ¶ 16. According to Brazill, Bush "became agitated" and responded:

> You're not gonna ask me ten questions so that you can go back to your dorm and write forty grievances. I don't have time for that. I have more important stuff to do.

*Id*. at 10, ¶ 17. Bush then ordered Brazill to leave his office. *Id*. at 10, ¶ 18.

On January 22, 2020, Defendant Jones denied Brazill's informal grievance concerning the athletic shorts. Jones stated: "This requirement is done at my directive." *Id*. at 10-11, ¶ 19. Brazill was dissatisfied with Jones's response, so he wrote a formal grievance to the Warden's office. *Id*. at 11, ¶ 20. Bush collected this formal grievance on January 23, 2020. *Id*. at 11, ¶ 21. Brazill alleges that Bush

immediately informed Defendants Jones and Bowen about Brazill's January 22, 2020, formal grievance.[5] *Id*. at 11, ¶ 22. Bush forwarded Brazill's formal grievance to Defendant Assistant Warden Hancock. *Id*. at 11, ¶ 23.

On January 23, 2020, at approximately 7:10 a.m., Bowen entered Brazill's dormitory and summoned Brazill to the dayroom. *Id*. at 11, ¶ 25. Bowen ordered all other inmates in the dayroom to leave. *Id*. at 11, ¶ 26. Bowen stated, "I hear you been having some problems." *Id*. at 12, ¶ 32. Brazill asked, "Such as?" Bowen responded: "Class A and that type of thing." *Id*. at 12, ¶¶ 33-34. Bowen noted that Brazill had filed "multiple grievances," and that Bowen "looked at [Brazill's] file; that's why I'm here talking to you." *Id*. at 12, ¶¶ 37-38. Bowen expressed his opinion that the uniform issue was "not that big of an issue" and not a "legitimate" grievance. *Id*. at 12, ¶ 36. Bowen told Brazill: "I'm here to ask you to slow down. I'm not saying you can't file grievances; just slow down with your grievances." *Id*. at 12, ¶¶ 35, 39.

---

[5] This is one of several examples of a specific allegation made by Brazill in his sworn complaint—which the undersigned assumes to be true for purposes of Defendants' Rule 12(b)(6) motion—that would not necessarily be accepted as "fact" at the summary-judgment stage. Brazill does not indicate that he personally witnessed Bush inform Jones and Bowen of Brazill's grievance. Absent personal knowledge, Brazill's allegation would not be competent to raise a fact issue precluding summary judgment, unless Brazill supported it with other materials that satisfied the Rule 56 standard. *See* Fed. R. Civ. P. 56(c)-(e).

According to Brazill, Bowen "had no responsibilities with respect to the inmate grievance process." *Id*. at 12, ¶ 41.

Following this conversation with Bowen, on January 23, 2020, Brazill wrote a formal grievance to the Warden's office complaining about having to wear the class A uniform during formal counts. *Id*. at 12-13, ¶ 42. On January 24, 2020, Bush collected this formal grievance. *Id*. at 13, ¶ 43. Brazill alleges that Bush immediately informed Jones and Bowen about Brazill's January 23, 2020, formal grievance, although Brazill does not state whether he personally witnessed this, or whether he merely is assuming this occurred. *Id*. at 13, ¶ 44. Bush forwarded Brazill's formal grievance to Hancock. *Id*. at 13, ¶ 45.

Assistant Warden Hancock was the Chairman of the ICT. *Id*. at 13, ¶ 46. On January 24, 2020, Hancock "convened an emergency meeting of the Classification Team" which consisted of Defendants Hancock, Jones, Pittman, Bush and Bowen. *Id*. at 13, ¶¶ 47-48. Although Brazill was not at the meeting, he alleges that this occurred:

> At the January 24 meeting, the Defendants discussed the grievances of Plaintiff Brazill, the individual meetings of Defendants Bush and Bowen with Plaintiff Brazill, and Plaintiff Brazill's continued complaints about the Graceville uniform policy. The Classification Team approved the transfer of Brazill from Graceville in accordance with longstanding FDOC policy and custom, to punish Plaintiff Brazill for his complaints about the Graceville uniform policy.

*Id*. at 13, ¶¶ 49-50.

On January 24, 2020, Brazill was transferred from Graceville to Jackson CI. *Id*. at 13, ¶ 51. On February 13, 2020, Plaintiff wrote a formal grievance to Defendant Brannon—the Warden of Graceville—claiming that his transfer was in retaliation for filing grievances. *Id*. at 13, ¶ 52.

Brazill alleges that on March 2, 2020, Brannon "held a meeting with Defendants Hancock, Jones, Pittman, Bush, and Bowen, about the January 24, transfer of Plaintiff Brazill from Graceville." *Id*. at 13, ¶ 53. Brazill alleges that this occurred during the meeting at Graceville:

> During the March 2 meeting, Defendants Hancock, Jones, Pittman, Bush, and Bowen, briefed Defendant Brannon about Plaintiff Brazill's grievances regarding the Graceville inmate uniform policy, the meetings of Defendants Bush and Bowen with Plaintiff Brazill, Plaintiff Brazill's continued complaints about the Graceville inmate uniform policy, and their decision to transfer Plaintiff Brazill from Graceville in accordance with longstanding FDOC policy and custom.

*Id*. at 14, ¶ 54. On March 2, 2020, Brannon "approved a ban prohibiting the transfer of Plaintiff Brazill back to Graceville because of Plaintiff Brazill's complaints about the Graceville inmate uniform policy." *Id*. at 14, ¶ 55. Brannon then "directed Defendant Bush to place a 'red flag' notation in Plaintiff Brazill's file noting the ban against his return to Graceville." *Id*. at 14, ¶ 56.

On March 9, 2020, Bush "hand delivered" to Brazill a response to Brazill's formal grievance dated February 13, 2020. *Id*. at 14, ¶ 57. The response "dismissed" Brazill's claim of retaliation. *Id*.

On March 14, 2020, and on April 14, 2020, Brazill wrote letters to Defendant Gordon complaining that his transfer from Graceville was retaliatory. *Id*. at 14, ¶ 58. On April 29, 2020, Gordon visited Jackson CI and met with Brannon, Hancock, Jones, Pittman, Bush, and Bowen. *Id*. at 14, ¶ 60. Brazill alleges that this occurred:

> At the April 29, meeting, Defendants Brannon, Hancock, Jones, Pittman, Bush, and Bowen briefed Defendant Gordon about Plaintiff Brazill's grievances regarding the Graceville inmate uniform policy, the meetings of Defendants Bush and Bowen with Plaintiff Brazill, Plaintiff Brazill's continued complaints about the Graceville inmate uniform policy, and their decisions to transfer and ban Plaintiff Brazill from Graceville as authorized by the longstanding FDOC policy and custom.

*Id*. at 14-15, ¶ 61. Gordon did not take "corrective, remedial, or disciplinary action" against the officers for their retaliatory transfer of Brazill, and "tacitly approved" the retaliatory ban of Brazill from Graceville. *Id*. at 15, ¶¶ 62-63.

In May, June, and July 2020, groups of inmates were transferred from Jackson CI to Graceville, but Brazill was not included in any of those groups. *Id*. at 15, ¶¶ 64-65, 67. On July 20, 2020, Brazill wrote a request to Hancock to be transferred to Graceville. *Id*. at 15, ¶ 66. On August 5, 2020, Hancock denied Brazill's request and

informed him: "You unfortunately have a red flag against being sent to the Graceville Work Camp." *Id*. at 15, ¶ 68.

Brazill claims that his transfer and ban from Graceville was in retaliation for his complaints about the Graceville inmate uniform policy. Brazill explains that the transfer constitutes an "adverse action" because although he retained his minimum security custody level, Jackson CI is "a more restrictive maximum security facility with more inmate-on-inmate violence and inmate deaths." *Id*. at 16, ¶ 71. In addition, Brazill no longer enjoys privileges that were available to him at Graceville, such as daily canteen, outdoor recreation, and the opportunity for an outside-the-gates work assignment. *Id*. at 16, ¶ 72.

Based on the foregoing allegations, Brazill claims that his transfer from Graceville "was so completely without merit as to allow the reasonable inference that his transfer and banning was undertaken for an improper purpose." *Id*. at 16-17, ¶ 76. Brazill elaborates that "the chronology of events indicate that but for Plaintiff Brazill's grievances complaining about Graceville's inmate uniform policy, Plaintiff Brazill would not have been transferred and banned from Graceville after only 16-days." *Id*. at 17, ¶ 77.

Concerning Defendant Secretary Dixon, Brazill claims that Dixon knew that there was a widespread custom within the FDC to transfer inmates in retaliation for

their complaints about confinement conditions, and that Brazill's transfer and ban were caused by that custom. *Id*. at 17, ¶ 78. Brazill also maintains that Dixon failed to train subordinate prison officials about the unlawfulness of retaliatory transfers. *Id*. at 17, ¶ 79. Brazill goes on to describe his and other inmates' prior complaints of retaliatory transfers. *Id*. at 17-24, ¶¶ 80-122.

As relief in this lawsuit, Brazill seeks a declaratory judgment that (1) his transfer and ban from Graceville was retaliatory and violated his First-Amendment rights; and (2) the FDC has a custom and practice of retaliatory transfers. *Id*. at 25, 27. Brazill also seeks an injunction requiring: (1) the removal of the "red flag" banning Brazill from Graceville; (2) the transfer of Brazill to Sago Palm Re-Entry Center; and (3) court approval before any future transfer of Brazill. *Id*. at 27. In addition, Brazill seeks $100.00 in nominal damages and $75,000.00 in punitive damages against each Defendant in his individual capacity. *Id*. at 27.

### III. RULE 12(b)(6) STANDARD

Rule 12 of the Federal Rules of Civil Procedure authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, that is, "across the line from conceivable to plausible." *Id*., 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678 (reiterating that although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). The mere possibility that the defendant acted unlawfully is insufficient. *Iqbal*, 556 U.S. at 678; *see also* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-36 (3d ed. 2004) (noting that a "pleading must contain something more . . . than . . . a statement of facts that merely creates a

suspicion [of] a legally cognizable right of action"). A complaint also may be dismissed for failure to state a claim "when its allegations, on their face, show that an affirmative defense bars recovery on the claim." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003); *see also Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1022 (11th Cir. 2001); *Jones v. Bock*, 549 U.S. 199, 215 (2007) (reiterating that principle).

In considering a motion to dismiss for failure to state a claim, the court accepts all well-pleaded factual allegations in the complaint as true and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir. 1994). Mere "labels and conclusions" are not accepted as true. *Twombly*, 550 U.S. at 555; *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013).

## IV. Discussion

### A.   <u>Brazill's Claims Are Not Time-Barred</u>

Defendants assert that Brazill's claims are barred by the statute of limitations. Defendants acknowledge that the Eleventh Circuit historically has applied Florida's four-year statute of limitations governing personal injury actions—Fla. Stat. § 95.11(3)—to all claims brought under 42 U.S.C. § 1983. Defendants maintain,

however, that federal courts in Florida now should recognize an exception for *prisoner* § 1983 claims that *do not allege a physical injury*. To those claims, Defendants say, federal courts should apply Florida's one-year limitations period—Fla. Stat. § 95.11(5)(g). Defendants maintain that this change is justified by the Florida Supreme Court's decision in *Green v. Cottrell*, 204 So. 3d 22 (Fla. 2016). Doc. 58 at 4-8.

In *Green*, the Florida Supreme Court confirmed that if a prisoner files a state-law claim alleging that he "suffered physical injury due to the negligent or wrongful acts or omission of the employees of a government entity," the four-year limitations period of Florida's general tort statute applies. *Green*, 204 So. 3d at 29. The court went on to distinguish prisoner tort claims that do *not* allege a physical injury. The court held that where no physical injury is alleged, the statute of limitations is governed by section 95.11(5)(g), Florida Statutes, which provides a one-year time limit for "'an action brought by or on behalf of a prisoner, as defined in § 57.085, relating to the conditions of the prisoner's confinement.'" *Green*, 204 So. 3d at 29 (quoting Fla. Stat. § 95.11(5)(g)).

Defendants maintain that because Florida now recognizes "two competing statutes of limitations which apply to prisoner torts," federal courts should stop applying a uniform limitations period to all § 1983 claims brought in Florida.

Page 14 of 41

Instead, federal courts should start differentiating between (1) § 1983 claims brought by prisoners versus those brought by non-prisoners, and (2) those Florida prisoner § 1983 claims that allege a physical injury versus those that do not. Doc. 58 at 6-7. As to those prisoner § 1983 claims that fail to allege a physical injury, federal courts should deem the one-year limitations period provided in Fla. Stat. § 95.11(5)(g) as the "most analogous state statute of limitations" and apply that limitations period. Doc. 58 at 5-6.

Applying that approach to this case, Defendants argue that because Brazill does not allege a physical injury arising from Defendants' alleged retaliatory transfer, the one-year limitations period under § 95.11(5)(g) applies. Brazill, therefore, was required to file this lawsuit by January 24, 2021. Doc. 58 at 7.

Defendants' position is contrary to United States Supreme Court precedent and binding Circuit precedent. In *Wilson v. Garcia*, 471 U.S. 261 (1985), the Supreme Court held that a § 1983 claim "can have no precise counterpart in state law," *Wilson*, 471 U.S. at 272, and that *all* § 1983 claims should be characterized in the same way for statute-of-limitations purposes. 471 U.S. at 272 ("[B]road characterization of all § 1983 claims best fits the statute's remedial purpose.").[6] The

_____

[6] *Wilson* was superseded in part by the enactment of 28 U.S.C. § 1658. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). But, as the Court clarified in *Jones*, 28 U.S.C. § 1658 "applies only to claims arising under statutes enacted after

*Wilson* Court also determined that of all the different ways § 1983 claims can be characterized, the "best alternative available" is "the tort action for the recovery of damages for personal injuries." *Wilson*, 471 U.S. at 276.   Thus, the Court held, "§ 1983 claims are best characterized as personal injury actions" and should be governed by the forum State's statute of limitations governing such actions. *Wilson*, 471 U.S. at 280. In *Owens v. Okure*, 488 U.S. 235 (1989), the Court clarified that, "where state law provides for multiple statutes of limitations for personal injury actions," courts must borrow and apply to all § 1983 claims "the general or residual statute for personal injury actions." *Id*. at 249-50.

Following the Supreme Court's guidance in *Wilson* and *Owens*, the Eleventh Circuit long ago abandoned the practice of determining the statute of limitations for § 1983 claims based on who brought the claim, the type of the underlying claim, or the factual allegations supporting it. *See Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999). In *Burton*, the Eleventh Circuit adopted a uniform statute of limitations for all § 1983 claims brought in Florida, specifically, Florida's four-year limitations period for personal injury actions in Section 95.11(3), Florida Statutes. *See Burton*, 178 F.3d at 1188 (citing *Owens*, 488 U.S. at 249-50; *Wilson*, 471 U.S.

_____

December 1, 1990," and it "leaves in place the 'borrowed' limitations period for pre-existing causes of action." *Jones*, 541 U.S. at 380, 382.

at 276). *Burton* was decided *after* the State of Florida's enactment in 1996 of the one-year limitations period provided in Section 95.11(5)(g), Florida Statutes.

Since *Burton*, the Eleventh Circuit has not wavered from the "one-statute-of-limitations-fits-all" approach to § 1983 claims brought in Florida. The Eleventh Circuit consistently has applied Florida's residual four-year statute of limitations governing personal injury actions to all § 1983 claims brought by prisoners regardless of the underlying claim and supporting factual allegations. *See Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003) ("Florida's four-year statute of limitations applies to such claims of deprivation of rights under 42 U.S.C. §§ 1983 and 1985."); *City of Hialeah v. Rojas*, 311 F.3d 1096, 1102 n.2 (11th Cir. 2002) ("Section 1983 claims are governed by the forum state's residual personal injury statute of limitations, which in Florida is four years"); *see also, e.g., Simpson v. Florida*, 708 F. App'x 635, 636 (11th Cir. 2018) (applying Florida's four-year limitations period to Florida prisoner's § 1983 claim arising from correctional officers' destruction of personal property); *Moore v. Chamberlain*, 559 F. App'x 969 (11th Cir. 2014) (same as to Florida prisoner's § 1983 medical deliberate indifference claims against prison officials (citing Fla. Stat. § 95.11(3)(p)));[7] *Baker*

---

[7] Section 95.11(3)(p), Fla. Stat., provides for a four-year limitations period to "[a]ny action not specifically provided for in these statutes."

*v. Sanford*, 484 F. App'x 291 (11th Cir. 2012) (same as to Florida's prisoner's § 1983 claim that prison officials provided inadequate medical treatment for his fungal infection (citing Fla. Stat. § 95.11(3)(p))); *Brown v. City of Miami*, 386 F. App'x 861, 862 (11th Cir. 2010) (same as to Florida prisoner's *Brady* claim brought under § 1983 (citing *Burton, supra*)).

Defendants' prediction that the Eleventh Circuit now would part with longstanding precedent governing § 1983 claims in light of the *Green* decision is unpersuasive. Defendants rely on *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1407 (11th Cir. 1998), which decided the appropriate limitations period for a disability-discrimination claim brought in Georgia under the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act. The court began its analysis by reiterating *Wilson*'s rule that if the forum State has passed a state law *identical* to the federal statute under which the plaintiff's claims are brought, that specific State limitations period should govern. *Everett*, 138 F.3d at 1409 (citing *Wilson*, 471 U.S. at 266-67). The court held that because "Georgia has not passed a state law identical to the Rehabilitation Act from which to borrow a limitations period," federal courts

should "apply Georgia's two-year statute of limitations period for personal injury actions" to RA and ADA claims arising in Georgia. *Everett*, 138 F.3d at 1409.[8]

Defendants posit that because Florida defines "prisoner" almost identically to the Prison Litigation Reform Act in 42 U.S.C. § 1997e, and because Florida has clarified that Fla. Stat. § 95.11(5)(g) applies to prisoner conditions-of-confinement claims that do not involve physical injury, it is likely that the Eleventh Circuit now would consider § 95.11(5)(g) the "most analogous statute" to § 1983 claims brought by prisoners concerning their confinement conditions where no physical injury is alleged. Doc. 58 at 5-7. Defendants' argument fails for several reasons. The undersigned will address the two most fundamental ones.

First, federal district courts cannot decide matters of law based on predictions of how the Eleventh Circuit might rule if asked to modify or overrule Circuit precedent. In *United States v. Vega–Castillo*, 540 F.3d 1235 (11th Cir. 2008), the court explained that under the prior-panel precedent rule, courts must follow a

---

[8] The court distinguished *Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222 (4th Cir. 1993). In *Wolsky* the Fourth Circuit applied the statute of limitations from the State of Virginia's anti-discrimination statute to federal claims brought under the RA. The court reasoned that Virginia's statute was "an exact state law counterpart" of the Rehabilitation Act. *Wolsky*, 1 F.3d at 225. The court in *Wolsky* distinguished federal law governing the limitations period for § 1983 claims, because "section 1983 actions *cannot* have parallel state law provisions." *Wolsky*, 1 F.3d at 225 (emphasis added).

decision of the Eleventh Circuit "unless and until it is overruled by [the Eleventh Circuit] en banc or by the Supreme Court." *Id*. at 1236 (internal quotation marks and citation omitted). "For the Supreme Court to overrule a case, its decision must have actually overruled or conflicted with [the Eleventh Circuit's] prior precedent." *Id*. at 1237 (internal quotation marks and citation omitted) (alteration adopted).

Second, *Green* and *Everett* are distinguishable on several fronts. Neither case involved a § 1983 claim. Neither case undermined the United States Supreme Court's determination that § 1983 claims "can have no precise counterpart in state law." *Wilson*, 471 U.S. at 272. Neither case addressed the Supreme Court's holding that a *single* forum State's limitations period applies to *all* § 1983 claims. *Wilson*, 471 U.S. at 272; *Owens*, 488 U.S. at 249-50. Thus, neither case alters the grounding principles underlying the Eleventh Circuit's adoption of Florida's residual personal injury statute of limitations, which is four years. *See Burton*, 178 F.3d at 1188; Fla. Stat. § 95.11(3)(p).

In short, *Burton* and *Chappell* remain binding precedent. Thus, for § 1983 claims arising in Florida, the applicable statute of limitations remains the four-year limitations period provided in Fla. Stat. § 95.11(3). Applying that limitations period to this case, Brazill's § 1983 claims are timely.

**B.**    **Brazill's Fourth Amended Complaint Sufficiently Alleges a First-Amendment Retaliation Claim Against All Defendants Except Dixon**

Brazill claims that the Defendants transferred him from Graceville—and banned him from returning there—in retaliation for his filing grievances concerning Graceville's uniform policy. Doc. 28. Defendants assert that Brazill's allegations fail to state a plausible First-Amendment claim, because he has no right to be incarcerated at a specific prison, and because the Defendants "could have transferred Plaintiff for any number of reasons beyond Plaintiff's allegations and would have been justified in doing so." Doc. 58 at 8-11.

### 1.    *First-Amendment Standard*

"It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." *Smith v. Mosely*, 532 F.3d 1270, 1276 (11th Cir. 2008) (citing *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)). "[A]n inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints." *Smith*, 532 F.3d at 1276; *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1968) (prison officials may not retaliate against inmates for filing lawsuits or administrative grievances).

"The gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989).

Therefore, although a prisoner has no protected liberty interest in remaining in a particular prison, *see Meachum v. Fano*, 427 U.S. 215, 225 (1976),[9] a prison transfer still may violate the prisoner's constitutional rights if done in retaliation for filing administrative grievances. *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989); *Bridges v. Russell*, 757 F.2d 1155, 1157 (11th Cir. 1985).

To prevail on a claim for retaliation, the inmate must establish that: "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith*, 532 F.3d at 1276 (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)).

### 2. *Brazill's Fourth Amended Complaint States a Plausible First-Amendment Retaliation Claim and Related Conspiracy Claim Against Defendants Jones, Bush, Hancock, Bowen, Brannon, and Gordon*

Taking the well-pleaded allegations of Brazill's fourth amended complaint as true, Brazill has alleged sufficient facts to state a retaliatory-transfer claim against Jones, Bush, Hancock, Bowen, Brannon, and Gordon in their individual capacities.

---

[9] *Meachum* held that the Due Process Clause, in and of itself, does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system." 427 U.S. at 225.

Defendants' broad argument—that Brazill fails to state a claim for retaliatory transfer because inmates have no right to be incarcerated at a specific prison and because inmate transfers are permissible under FDC rules—should be rejected. *See* Doc. 58 at 9-10.

"A prisoner states a viable claim when he alleges that prison officials retaliated against him because he exercised a First Amendment right;" "being transferred in retaliation for exercising federal constitutional rights is actionable under § 1983;" and "[c]onduct which is not in itself actionable under § 1983 becomes actionable if undertaken with a retaliatory motive." *Osterback v. Kemp*, 300 F. Supp. 2d 1238, 1251-53 (N.D. Fla.), *aff'd on reconsideration*, 300 F. Supp. 2d 1263 (N.D. Fla. 2003) (citations omitted).

Brazill's allegations, taken as true and construed in the light most favorable to him, establish a retaliatory transfer claim under the First Amendment. With regard to the first element of a First-Amendment retaliation claim, Brazill alleges that he filed grievances regarding Graceville's uniform policy. He therefore has established that his speech was constitutionally protected. *Smith*, 532 F.3d at 1277.

Brazill's complaint also alleges sufficient specific facts to support his conclusion that he suffered adverse consequences. He alleges that he was transferred to a more restrictive maximum security facility that has more inmate-on-inmate

violence and inmate deaths, reduced access to canteen and recreation privileges, and no opportunity for an "outside-the-gate" work assignment. Doc. 28 at 16, ¶¶ 71-72.

Applying the First-Amendment test, which is an objective one, a reasonable jury could conclude that Brazill's transfer and ban from Graceville was sufficiently adverse action that it likely would deter a person of ordinary firmness from engaging in protected speech. *Bennett*, 423 F.3d at 1254; *see also, e.g., Simpson v. Superintendent, Merrimack Cnty. Dep't of Corr.*, No. 13-cv-549-JD, 2014 WL 1404568 at *2 (D. N.H. Apr. 10, 2014) (in the prison context "[a] transfer to a more restrictive or less desirable environment can be an adverse action."); *Fox v. Vickers*, No. 3:12-CV-03034, 2014 WL 722599, at *5 (W.D. Ark. Feb. 26, 2014) ("Adverse actions may include a denial of privileges, acts worsening an inmate's working conditions, internal transfers to less desirable units, and transfer between prisons.").

Concerning the third element, Brazill's complaint alleges sufficiently specific facts to support Brazill's conclusion that Jones, Bush, Hancock, Bowen, Brannon and Gordon subjectively were motivated to, and did, transfer him because of his complaints about the Graceville uniform policies. Although Defendants are correct that they "could have" transferred him for any number of reasons that were not retaliatory, Brazill plausibly alleges that they *actually did* transfer him as punishment for filing grievances, which would be an unlawful reason. Brazill's complaint also

contains specific allegations of personal participation by Jones, Bush, Hancock, Bowen, Brannon and Gordon in the decision to transfer and ban Brazill from Graceville.

Brazill's complaint also sufficiently alleges that these Defendants came to an agreement to violate his constitutional rights and, therefore, conspired to retaliate against him. "A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Alabama*, 618 F.3d 1240, 1260 (11th Cir. 2010).

### 3.    *Brazill's Fourth Amended Complaint Fails to State a Plausible First-Amendment Retaliation Claim Against Dixon In His Official or Individual Capacity*

Brazill seeks to hold Secretary Dixon liable for the other Defendants' alleged retaliatory transfer of him. Doc. 28 at 17-24, ¶¶ 78-122. Brazill's allegations, however, fail to state a plausible claim for official-capacity or individual liability against Dixon.

### (a).   **Brazill Fails to State an Official-Capacity Claim**

Brazill's official-capacity claim against Dixon seeks to hold the FDC liable for the alleged retaliatory transfer. Brazill theorizes that his transfer and ban from Graceville in 2020 is "causally connected to longstanding FDOC policy and custom of authorizing retaliatory transfers to punish inmates who complain about prison conditions." Doc. 28 at 24, ¶ 119.

"Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S 658, 690 n.55 (1978)); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Thus, in a section 1983 action "a claim against a defendant in his official capacity is the same as a claim against his employer." C*hristman v. Saint Lucie County, Florida.*, 509 F. App'x 878, 879 (11th Cir. 2013) (citing *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 785 n.2 (1997)); *Faulkner v. Monroe Cnty. Sheriff's Dep't.*, 523 F. App'x 696, 701 (11th Cir. 2013) ("A suit against a person in their official capacity is to be treated as a suit against the entity.").

"A governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation . . . thus, in an official capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham*,

473 U.S. at 166 (citations omitted). To establish liability against an official in his official-capacity, a plaintiff must allege that:

(1) his constitutional right was violated;

(2) there was a custom or policy that constituted deliberate indifference to that constitutional right; and

(3) the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell*, 436 U.S. at 694-95.

To establish a policy, "a plaintiff must identify either (1) an officially promulgated [FDC] policy or (2) an unofficial custom or practice of the [FDC] shown through the repeated acts of a final policymaker for the [FDC]." *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 819 (11th Cir. 2017) (internal quotation marks and citation omitted). A government entity "rarely will have an officially-adopted policy of permitting a particular constitutional violation." *Grech v. Clayton County, Georgia*, 335 F.3d 1326, 1330 (11th Cir. 2003). Thus, most plaintiffs must show that the entity "has a custom or practice of permitting the violation and that the [entity's] custom or practice is the moving force behind the constitutional violation." *Knight*, 856 F.3d at 819 (citation omitted).

Page 27 of 41

"A custom is a practice that is so settled and permanent that it takes on the force of law." *Knight*, 856 F.3d at 819; *see also Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011) ("An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a[n] [entity] to liability on the theory that the relevant practice is so widespread as to have the force of law." (alteration adopted) (quotation omitted)).

Although Brazill uses the term "policy," he does not identify an officially promulgated FDC policy that authorizes prison officials to transfer inmates as punishment for complaining about the conditions of their confinement. Nor does Brazill describe the "policy" with any level of specificity. Brazill's conclusory allegation that his transfer was pursuant to FDC policy is insufficient to state a claim for relief under § 1983 against Dixon in his official capacity. *See Twombly*, 550 U.S. at 555; *see also, e.g., Grider v. Cook*, 522 F. App'x 544, 547-48 (11th Cir 2013) (dismissing plaintiff's claims against sheriff's office and county because the plaintiff "state[d] nothing more than conclusory allegations" that a policy existed).

Brazill attempts to show a "custom" of retaliatory transfers by describing three lawsuits—filed several years ago by Brazill and two other inmates—in which they claimed that they were subject to retaliatory transfers. Brazill describes:

(1)     ***Brazill v. Cowart***, **No. 2:10-cv-458-FtM-29DNF (M.D. Fla. July 21, 2010) (Compl.)**. This was a federal civil rights action Brazill filed in the Middle District of Florida in 2010, against prison officials in their individual and official capacities alleging a First-Amendment retaliation claim. Specifically, Brazill alleged that he was transferred in 2009 from Desoto CI to Okeechobee CI, and then from Okeechobee CI to a different prison, in retaliation for filing a lawsuit in state court against a particular prison official (Bethyl Cowart).

(2)     ***Smith v. McDonough***, **No. 2:06-cv-14201-RLR (S.D. Fla. Aug. 11, 2006) (Compl.)**. This was a federal civil rights action filed by inmate Glenn C. Smith in the Southern District of Florida in 2006, against then-FDC Secretary James McDonough in his official capacity, alleging that (1) Smith was transferred in 2003 from Martin CI to Okeechobee CI in retaliation for filing lawsuits against the FDC, and (2) the FDC had a widespread practice and custom of transferring inmates in retaliation for exercising their First-Amendment rights.

(3)     ***Osterback v. Kemp***, **No. 4:01-cv-00207-WCS (N.D. Fla. June 5, 2001) (Compl.)**. This was a federal civil rights action filed by inmate Mark Osterback in the Northern District of Florida in 2001, against prison officials

in their individual capacities alleging that in 2000, they transferred Osterback from Walton CI to Santa Rosa CI, and then from Santa Rosa CI to Hamilton CI, in retaliation for filing lawsuits, grievances, and an unfounded complaint with The Florida Bar against a Santa Rosa CI law librarian (Barry Rhodes). *See also Osterback v. Kemp*, 300 F. Supp. 2d 1238 (N.D. Fla. 2003).

Doc. 28 at 17-22, ¶¶ 80-106.

These lawsuits—which are Brazill's only allegations to support his official-capacity claim against Dixon—fail to raise a reasonable inference of an unofficially adopted policy or custom of retaliatory transfers that the FDC Secretary implemented or allowed. As an initial matter, the sheer number of prisoners who have made *allegations* of retaliatory transfers, without more, does not support a reasonable inference of a widespread custom or practice of retaliatory transfers. *See Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[T]he number of complaints bears no relation to their validity."); *cf. Buckler v. Israel*, 680 F. App'x 831, 835 (11th Cir. 2017) ("[T]he sheer number of use of force incidents, without more, does not establish a widespread custom of acquiescence to the use of excessive force.").

This is especially true here, where the *outcomes* of the lawsuits Brazill describes do not support a reasonable inference that the FDC had a widespread

custom or practice of retaliatory transfers. The *Smith* case resulted in a verdict *against* the inmate. Specifically, the district court found—after a bench trial—that Smith failed to produce sufficient evidence that his transfer was retaliatory. Having made that finding, the district court held that the evidence Smith offered to support his custom-or-policy claim against the FDC (including Brazill's and other prisoners' testimony concerning their own transfers) was irrelevant. *See Smith v. Fla. Dep't of Corr.*, No. 2:06-cv-14201-ROSENBERG/LYNCH, 2015 WL 4639061 (S.D. Fla. Aug. 4, 2015), *aff'd*, 696 F. App'x 944 (11th Cir. 2017).

Regarding the other two lawsuits, the court takes judicial notice that the *Brazill* and *Osterback* suits were settled or voluntarily dismissed.[10] *See* Attachs. 1, 2. These dispositions do not, without admissions of liability, put the FDC on notice of any pattern of constitutional violations. *See Buckler*, 680 F. App'x at 836 (holding

---

[10] A court may take judicial notice of facts that are "not subject to reasonable dispute," because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court may take judicial notice *sua sponte* at any stage of a proceeding. Fed. R. Evid. 201(c)-(d); *see also Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) ("Although this matter is before the court on a motion to dismiss, we may take judicial notice of the court documents from the state eviction action."); *McCone v. Thorpe*, 828 F. App'x 697, 698 (11th Cir. 2020) ("A district court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment."); *Ellison v. Postmaster Gen., U.S. Postal Serv.*, No. 20-13112, 2022 WL 4726121, at *6-7 (11th Cir. Oct. 3, 2022) ("It is clear a district court, at the motion to dismiss stage, may take judicial notice of relevant public documents.").

that two lawsuits that were settled or voluntarily dismissed did not, without admissions of liability, put the sheriff's office on notice of any pattern of constitutional violations).

Thus, Brazill's allegations concerning the three inmate lawsuits—which are the only allegations supporting his claim of an FDC policy or custom—do not support a reasonable inference that the FDC had a policy or widespread custom of retaliatory transfers that caused the transfer at issue in this case. Nor do Brazill's allegations show that the Secretary knew of a pattern of constitutional violations. For these reasons, Brazill's fourth amended complaint fails to state a plausible official-capacity claim against Dixon.

### (b).    **Brazill Fails to State an Individual-Capacity Claim**

Brazill seeks to hold Dixon individually liable for the other six Defendants' decision to transfer Brazill. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). In other words, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id*. at 677.

"[S]upervisors are liable under [section] 1983 'either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'" *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)); *Keith v. Dekalb County, Georgia*, 749 F.3d 1034, 1047-48 (11th Cir. 2014) (identifying and applying that standard to determine whether supervisor was liable in his individual capacity under § 1983 for an alleged constitutional violation); *Franklin*, 738 F. 3d at 1249 (same).

As with all individual-capacity § 1983 claims, the plaintiff must plead sufficient factual matter to show that the supervisor acted with the same mental state required to establish a constitutional violation against his subordinate. *See Iqbal*, 556 U.S. at 677 (plaintiffs could not maintain claim against supervisors based on subordinates' unconstitutional discrimination unless plaintiffs alleged specific facts showing that the supervisors, themselves, purposefully discriminated against the plaintiffs on the basis of their race, religion, or national origin); *Franklin* at 1249 (to state a claim under § 1983 against a supervisor for the violation of the plaintiff's constitutional rights, the court must first identify the precise constitutional violation charged and then determine whether the complaint alleges the required elements);

Page 33 of 41

*see also Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) ("A plaintiff may [ ] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."); *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) (a supervisor-defendant is liable only if he or she personally displayed the same mental state required to establish a constitutional violation by his or her subordinate).

> With regard to establishing the requisite causal connection,

> [t]he necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Keith*, 749 F.3d at 1048 (alteration in original) (quoting *Cottone*, 326 F.3d at 1360). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks omitted). "In short, the standard by which a

supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Keith*, 749 F.3d at 1048 (internal quotation marks omitted) (citation omitted) (alteration adopted).

Brazill does not allege that Dixon personally participated in the decisions to transfer and ban him from Graceville in January 2020. Nor does Brazill allege that Dixon knew the other six Defendants were going to transfer Brazill in retaliation for filing grievances, but failed to stop them.

Rather, Brazill seeks to hold Dixon individually liable based on three alternative theories. All of Brazill's theories are predicated on his *assumption* that Dixon had superintendent responsibilities over the Defendants at the time of Brazill's transfer.

Brazill's first theory is a "custom" theory. Brazill alleges that:

> As Secretary, Defendant Dixon adopted and maintained the custom and practice of allowing and permitting Defendants Jones, Hancock, and Brannon, to ignore and disregard official FDOC policies, and to take actions, make decisions, and implement local institutional policies that were contrary to and inconsistent with officially established FDOC policies such that they set all FDOC policies at the Jackson Correctional and Graceville facilities.

Doc. 28 at 17, ¶ 78.

Brazill's second theory is a "failure-to-train" theory. Brazill alleges that:

> [A]s Secretary, Defendant Dixon failed to train subordinate prison officials that it is unlawful for them to transfer and ban inmates from

Page 35 of 41

> prison facilities as punishment because the inmates complain about
> prison conditions at those facilities[.]

Doc. 28 at 17, ¶ 79; *see also id.* at 26 ("Count VII: First Amendment Retaliation

Claim Against Dixon as Secretary for Failure to Train").

Brazill's third theory is a "deliberate indifference to widespread abuse"

theory. Brazill alleges that:

> Defendant Dixon has been deliberately indifferent to the widespread,
> persistent, and longstanding FDOC policy and custom permitting the
> transferring and banning of inmates from prison facilities because the
> inmates complain about prison conditions at those facilities.

*Id.* at 17, ¶ 79; *see also id.* at 26 ("Count VI: First Amendment Retaliation Claim

Against Dixon as Secretary for Supervisory Policies or Customs Evincing Deliberate

Indifference to Unlawful Retaliation").

Setting aside the internal inconsistency of Brazill's theories—that the

subordinate Defendants' actions were both contrary to FDC policy yet in

conformance with it—Brazill fails to state a plausible basis to hold Dixon liable in

his individual capacity for the actions of Jones, Bush, Hancock, Bowen, Brannon

and Gordon.

One fatal flaw overarching all of Brazill's theories is that he fails to plausibly

show that at the time of Brazill's transfer in 2020, Dixon was responsible for making

policy, training or transfer decisions, or that he had any superintendent

responsibilities over the other six Defendants. *See Keith*, 749 F.3d at 1048. Brazill refers to Dixon as "Secretary," but the court takes judicial notice that Dixon was not appointed the Secretary of the FDC until November 2021, which is long *after* Brazill's transfer from Graceville in January 2020. *See* www.dc.state.fl.us/secretary.html (last viewed Feb. 1, 2023). Brazill's failure to satisfy this basic element—establishing Dixon's responsibility—dooms all of his alternative theories for holding Dixon individually liable for the retaliatory transfer.

Notwithstanding that fatal flaw, Brazill's individual-capacity claim against Dixon fails for additional reasons.

> ### i.    *Brazill's first theory—that the retaliatory transfer was caused by Dixon's adopting and maintaining a custom of allowing Jones, Hancock and Brannon to ignore and disregard official FDC policies—is conclusory*

Brazill states his *conclusion* that Dixon had a custom of allowing Jones, Hancock and Brannon to ignore official FDC policies and to set their own transfer policies at Jackson CI and Graceville. Doc. 28 at 17, ¶ 78; *see also* Doc. 61 at 22. But Brazill's supporting allegations do not bear that out. None of the examples Brazill provides of other retaliatory transfers involved Jackson CI or Graceville. *See* Doc. 28 at 17-22. Nor does Brazill allege that any of the other retaliatory transfers involved Jones, Hancock, Brannon, or any other Defendant in this lawsuit. *Id.* Brazill's first theory, therefore, fails to plausibly show that Dixon knew that

Page 37 of 41

policymakers at Jackson CI and Graceville routinely retaliated against inmates, and that Dixon allowed them to do so in violation of FDC policy.

> ## ii.   *Brazill's second and third theories fail because they rely on the same "policy or custom" allegations as Brazill's official-capacity claim*

Brazill asserts that Dixon caused Brazill's retaliatory transfer in January 2020, because five years prior to that, Brazill "discussed with[Dixon] the pattern of prison officials transferring inmates in retaliation for complaining about prison conditions," but Dixon failed to correct the problem. Doc. 28 at 22, ¶ 107. In support, Brazill alleges that on June 25, 2015, Dixon was touring Charlotte Correctional Institution, when Brazill discussed with him the three lawsuits detailed above in Section IV.B.3.a., namely: (1) *Brazill v. Cowart*, No. 2:10-cv-458-FtM-29DNF; (2) *Smith v. McDonough*, No. 2:06-cv-14201-RLR; and (3) *Osterback v. Kemp*, No. 4:01-cv-00207-WCS. *See* Doc. 28 at 22-24, ¶¶ 107-119.

Brazill maintains that notifying Dixon in 2015 of the three prior lawsuits renders Dixon liable for Brazill's later transfer in 2020, because it establishes that (1) Dixon "has not taken any corrective, remedial, or disciplinary action, and has not caused the retraining of any prison official;" and (2) Dixon was "deliberately indifferent to the widespread, persistent, and longstanding FDOC policy and custom permitting the transferring and banning of inmates from prison facilities because the

inmates complain about prison conditions at those facilities." Doc. 28 at 24, ¶¶ 120-121; *see also id*. at 17, ¶ 79.

As discussed above, however, the three lawsuits do not plausibly show that there was a policy, custom, or history of widespread retaliatory transfers within the FDC. Thus, even assuming to Brazill's benefit that Dixon held a sufficient supervisory position at the time of Brazill's transfer in 2020 that *could* expose Dixon to individual liability on a failure-to-train or deliberate-indifference-to-widespread-abuse theory, Brazill's allegations do not state a plausible basis to infer that Dixon caused Brazill's retaliatory transfer.

Brazill's allegations, taken as true and construed in the light most favorable to him, fail to establish a plausible basis to hold Dixon individually liable for the transfer of Brazill from Graceville. Thus, Brazill's individual-capacity claim against Dixon should be dismissed for failure to state a claim.

## C.   **The Remaining Portions of Defendants' Motion to Dismiss Should Be Denied Without Prejudice**

The remainder of Defendants' motion seeks to limit Brazill's recovery in the event that one or more claims are allowed to proceed. Specifically, Defendants urge the court to (1) deny Brazill's specific requests for injunctive relief; (2) reduce the amount of Brazill's potential recovery of nominal damages from $100.00 to $1.00; and (3) limit the amount of Brazill's potential recovery of punitive damages. Doc.

58 at 21-29. A ruling on these issues is unnecessary at this early stage of the case, as it would not be dispositive of this litigation or of any claim. Defendants do not argue that no remedy is available to Brazill.

## V. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.     Defendants' motion to dismiss, Doc. 58, be **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     Defendants' motion to dismiss should be **GRANTED** as to Plaintiff's individual and official-capacity claims against Secretary Ricky D. Dixon, and these claims should be **DISMISSED**:

    b.     Defendants' motion to dismiss should be **DENIED** in all other respects.

2.     This matter be returned to the undersigned for further pretrial proceedings on Plaintiff's individual-capacity First-Amendment claims against Defendants Jones, Bush, Hancock, Bowen, Brannon and Gordon. Such pretrial proceedings may include requiring Plaintiff to file an amended

complaint that removes his claims and factual allegations against Secretary

Dixon.[11]

At Panama City, Florida, this <u>3rd</u> day of February, 2023.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636. The parties also are advised that if they dispute the accuracy of any judicially-noticed fact, or if they otherwise wish to be heard on the propriety of the court taking judicial notice of that fact, they must raise this issue in an objection to this report and recommendation.**

---

[11] *See* N.D. Fla. Loc. R. 15.1(A). Requiring Brazill to amend his complaint to remove his claims for relief and related allegations against Secretary Dixon (paragraphs 78-122 of the fourth amended complaint), will clarify the issues going forward and better enable the remaining Defendants to prepare a responsive pleading.